# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 9, 2011 Session

## STATE OF TENNESSEE v. TYRONE RALPH WRIGHT

**Direct Appeal from the Circuit Court for Coffee County**
**No. 35237F      L. Craig Johnson, Judge**

---

**No. M2010-02096-CCA-R3-CD - Filed February 23, 2012**

---

A Coffee County jury convicted the Defendant, Tyrone Ralph Wright, of one count of theft of property under $500 and one count of forgery over $1000.  The trial court sentenced the Defendant as a career offender to an effective sentence of twelve years.  The Defendant appeals, arguing that: (1) the trial court erred when it denied his motion to suppress evidence obtained during the search of a vehicle in which the Defendant was a passenger; (2) the trial court erred when it admitted evidence of an uncharged forgery; (3) the trial court erred when it failed to charge the jury on a lesser included offense; (4) the identification of the Defendant submitted at trial violated the "physical facts rule;" (5) the evidence at trial was insufficient to sustain his convictions; (6) he was denied his right to allocution at the sentencing hearing; and (7) the trial court erred when it sentenced him.  After a thorough review of the record and applicable law, we conclude that there is no error in the judgments of the trial court, and we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Gerald L. Ewell, Jr., Tullahoma, Tennessee, for the appellant, Tyrone Ralph Wright.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Mickey Layne, District Attorney General; Felicia Walkup, Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's involvement in the theft of checks and the subsequent passing of the stolen checks in June 2006. For these events, a Coffee County Grand Jury indicted the Defendant for one count of theft of property under $500 and one count of forgery over $1000.

## A. Suppression Hearing

The trial court held a suppression hearing to address whether the police stop of the vehicle in which the Defendant was a passenger was a legal stop. The parties presented the following evidence at the suppression hearing: Thomas Tharpe testified that on June 12, 2006, he was employed by the Benton County Sheriff's Office as a Drug Task Force agent. He recalled that, while working that day, he was patrolling Interstate 40 ("I-40") in an unmarked SUV, which he parked in the median of the interstate. Agent Tharpe gave the following testimony as to his observation of a maroon Cadillac traveling on I-40:

> [The Cadillac] was heading eastbound towards Nashville, and it topped a hill. There is a truck, and it topped a hill about the same time, and then as soon as the Cadillac saw me, he immediately pulled in behind a semi tractor-trailer and was just glued to his bumper. Even [as] he passed me, I noticed [the Cadillac] was still just right on [the tractor-trailer's] bumper. I pulled up behind [the Cadillac] and conducted a traffic stop.

Agent Tharpe testified that, before conducting the stop, he did not know the race of the occupants of the Cadillac. Agent Tharpe explained that he was focused on the traffic violation. Agent Tharpe said, "[The Cadillac] was following too closely. There is no way, if the truck had to brake for any reason, there is no way [the Cadillac] could have stopped in time." Agent Tharpe recalled that the Cadillac was less than one car length in distance from the tractor-trailer.

Agent Tharpe testified that, upon approaching the Cadillac, he discovered that Raymond Redd was the driver of the Cadillac, and the Defendant was the only passenger in the vehicle. Agent Tharpe learned that the Cadillac belonged to Redd's girlfriend and neither Redd nor the Defendant possessed a driver's license or identification. Upon further questioning from Agent Tharpe, Redd and the Defendant became "evasive" in response to Agent Tharpe's questions. Agent Tharpe recounted how he contacted Deputy Hardin, an officer working with Agent Tharpe that day, to assist him.

On cross-examination, Agent Tharpe agreed that the traffic stop lasted "about two hours" because he had to "track down" information about both Redd and the Defendant. Agent Tharpe testified that he did not stop the Cadillac based on race or because he believed

illegal drugs were in the Cadillac.

James Hardin testified that, in June 2006, he worked for the Drug Task Force Agency. Deputy Hardin recalled that Agent Tharpe requested his assistance during a traffic stop of a Cadillac in which the Defendant was a passenger. Deputy Hardin asked the driver of the Cadillac, Redd, for permission to search the vehicle, and Redd consented to a search of the trunk area of the vehicle but refused to sign a waiver form. Because Redd refused to sign the consent form, Officer Hardin instead walked his canine partner around the perimeter of the vehicle.

On cross-examination, Hardin testified that he was unaware of the race of the occupants of the car at the time he was called to the scene.

Based upon this evidence, the trial court denied the Defendant's motion to suppress, finding that the Defendant "lacks standing to attack the traffic stop." Subsequently, the United States Supreme Court issued *Brendlin v. California,* which held that passengers are seized during a traffic stop and thereby have the standing to contest an illegal seizure. *Brendlin v. California*, 551 U.S. 249 (2007). At the Defendant's motion for a new trial, the trial court reconsidered the current case in light of *Brendlin* and found the traffic stop legal.

## B. Trial

At the Defendant's trial, the parties presented the following evidence: Thomas Tharpe testified that in June 2006, he worked as a 24th Judicial Drug Task Force agent. On June 12, 2006, Agent Tharpe was patrolling I-40, conducting criminal interdiction stops. Agent Tharpe said that he was parked along I-40 when he observed a maroon Cadillac and a truck topping a hill at the same time. Agent Tharpe assumed the Cadillac saw him because the Cadillac immediately pulled directly behind a semi tractor-trailer and continued to follow "very closely" as the Cadillac drove past Agent Tharpe's parked vehicle.

Agent Tharpe testified that he activated his blue lights and conducted a traffic stop based upon the unsafe distance maintained between the tractor-trailer and the Cadillac. Agent Tharpe approached the Cadillac from the passenger side and observed a driver, Redd, and one passenger, the Defendant. When asked for identification, Redd explained to Agent Tharpe that he had left his driver's license at home. Agent Tharpe then asked the Defendant for identification, and the Defendant told Agent Tharpe that he did not have any identification. As Agent Tharpe talked with the two men, he noticed they acted "nervous" and were "being evasive." Based upon their actions, Agent Tharpe called his partner, Deputy Hardin for back up. Deputy Hardin was also working along I-40 and arrived "no longer than 10 minutes" after Agent Tharpe requested assistance.

Agent Tharpe testified that Deputy Hardin conducted "most" of the search of the vehicle. As a result of the search, Deputy Hardin found, underneath the floormat on the front passenger side of the vehicle, two driver's licenses depicting the same person but listing the name Mark Campbell on one license and Raymon Wallace on the other license. Deputy Hardin also found four Larry Thomas Transportation business checks and a fake Mississippi driver's license and a social security card, both bearing the name Ronald Wayne Gaylord. Agent Tharpe testified that the picture on the driver's license for Ronald Gaylord appeared to be the Defendant. Neither of the occupants of the car identified themselves by any of the names listed on the driver's licenses or the social security card. When Agent Tharpe asked Redd and the Defendant about the items, both men responded that the Cadillac was not their vehicle and that they knew nothing about the items.

Agent Tharpe testified that, based upon the items found in the car, he was suspicious that Redd and the Defendant intended to use the fake identification to cash unauthorized checks. Tharpe called the phone number listed on the check and spoke with Larry Thomas, Sr., who confirmed he was missing business checks matching the check numbers Deputy Hardin found in the stopped vehicle.

On cross-examination, Agent Tharpe confirmed that he asked Deputy Hardin to conduct a canine search of the vehicle because of the occupants' behavior. Agent Tharpe agreed that he confirmed that the Cadillac was owned by Beverly Jackson[1], whom Redd described as his girlfriend. During the canine search, the canine officer "indicated" on the passenger door and, subsequently, Deputy Hardin searched the vehicle, finding the driver's licenses, social security card, and business checks. Agent Tharpe said that these items were found in an envelope under the floormat.

James Hardin, a Benton County Sheriff's Department deputy, testified that, on June 12, 2006, he responded to Agent Tharpe's request for assistance with a traffic stop. Deputy Hardin asked the driver, Redd, for consent to search the vehicle, and Redd agreed to a search of the trunk but refused to sign a waiver agreeing to the search. Due to Redd's refusal to sign the waiver, Hardin conducted a canine search of the perimeter of the vehicle and the canine officer "indicated" on the passenger side of the vehicle. Hardin then conducted a search of the vehicle and found an envelope lying under the passenger side floormat. The envelope bore the name "Beverly Jackson," who he learned was Redd's girlfriend, and a Memphis address. Inside the envelope, Hardin found checks and multiple driver's licenses.

---

[1] In the trial transcript, witnesses refer to the owner of the Cadillac as both "Beverly Jackson" and "Beverly Bowman." For the sake of consistency and clarity, we refer to the owner of the Cadillac as "Beverly Jackson."

Larry Thomas, Sr., testified that he owned Larry Thomas Transportation located in Manchester, Tennessee. On June 9, 2006, Thomas left work early. Several days later, he received a call from police asking if he was missing any checks. Thomas checked his business check binder and found two full pages of checks missing. The missing checks were numbered 3338 through 3343. Thomas identified the checks found in the Cadillac as the checks missing from his business check binder. Thomas testified that he, his wife, and his son were the only employees and the only persons with check-writing authority for the business account. He testified that the name "Larry Thomas" signed on two of the checks was not his handwriting, his wife's handwriting, or his son's handwriting.

On cross-examination, Thomas identified pictures of his business office and agreed there was a back door into his business. Thomas said that he normally kept the business checkbook in the second drawer on the right-hand side of his desk.

Larry Thomas, Jr., testified that, in June 2006, he worked at Larry Thomas Transportation. On Friday, June 9, he was behind the business office working on a vehicle when a maroon Cadillac pulled in the front entrance, stopped, backed up and then drove in front of the office out of his view. Thomas Jr. began to walk toward the front of the office when Redd came around the corner and told him he was interested in purchasing a vehicle and directed Thomas Jr. to a nearby van. After looking at the van, Redd told Thomas Jr. that he was in the carpet business and suggested a van located furthest from the front road might be better so the men walked over to the second van. Thomas Jr. estimated he spent approximately twenty-five to thirty minutes with Redd looking at vehicles.

Thomas Jr. testified that, because of the location of the vans Redd examined, he was unable to see the front door of the business. He had no indication, however, that there was anyone else on the lot until he and Redd began to walk toward the front of the business office, where Redd's vehicle was parked. At that point, the Defendant appeared and spoke to Redd, then all three men went and looked at the second van again for approximately eight to fifteen minutes. Redd and the Defendant said they were "doing a job" in town and needed to get back to work but would return later to test drive and possibly purchase the van. Before leaving, the Defendant went inside the business office briefly to use the restroom while Redd and Thomas Jr. remained outside.

Thomas Jr. testified that at that time he, his father, and his mother were the only people with check-writing authority for the business account. He said that the business checkbook was not kept out in plain sight but in a desk drawer. Thomas Jr. viewed the two Larry Thomas Transportation checks bearing the signature, "Larry Thomas," and denied that either were his signature. Thomas Jr. testified that he was familiar with his parents' signatures and that the signatures on the checks were neither his mother's nor his father's

-5-

signature.

Thomas Jr. testified that he normally signed checks "Larry D. Thomas" to distinguish between a check signed by him and a check signed by his father. Thomas Jr. identified two separate photographic line-ups police showed him a few days after he learned the business checks were missing. In one of the photographic line-ups, Thomas Jr. identified the Defendant as one of the two men he spoke with on June 9. Thomas Jr. said that he was unable to identify the first man he spoke with from the other photographic line-up.

William Sipe, a Manchester City Police Department officer, testified that Larry Thomas, Sr. reported to police that six business checks had been stolen from his place of business. Thomas Sr. also said he learned of this when Agent Tharpe contacted him and indicated that he had recovered four of the stolen business checks. Officer Sipe met with Thomas Sr. and learned that one of the business checks may have been passed on June 9, 2006, in Manchester at the First National Bank. Based upon this information, Officer Sipe reviewed video footage from the Manchester First National Bank and confirmed that the Defendant passed check number 3338 at that location. Officer Sipe interviewed Leah Trail, the bank teller who assisted the Defendant when he passed the check. Trail told Officer Sipe that a black man in his forties presented the check, which was made payable to a Ronald Gaylord in the amount of $1500. Trail said that the man inquired about whether there was another branch bank in the area, and Trail gave the man directions to the First National Bank in Woodbury, Tennessee. The video surveillance footage from the bank showing the man who passed the Larry Thomas Transportation check number 3338 was played for the jury. Officer Sipe described the man's appearance in the video as "a black male, somewhat slender build, wearing a beanie cap, if you will, and a white t-shirt." Our review of this video, which the jury watched, shows that the man also wore blue jean shorts and dark shoes with some white accents.

As part of his investigation, Officer Sipe discovered that a second Larry Thomas Transportation business check, check number 3339, had been passed at the Woodbury First National Bank. He reviewed the videotape recordings from the Woodbury bank branch, and the State played that video for the jury. The video depicted a man dressed similarly to the man who passed the check at the Manchester branch of the First National Bank. The man wore a "beanie-type cap," a white T-shirt, blue jean shorts, and a pair of tennis shoes that were predominantly dark with some white accents. The video surveillance footage indicated that the date of this transaction was June 9, 2006, at 4:50 p.m. Officer Sipe learned that the bank teller assisting the Defendant cash the check was Melissa Burnett and that the check passed was number 3339 in the amount of $1500.

Officer Sipe testified that during his investigation he gathered multiple pieces of

evidence in addition to those he gathered from the banks. He collected items that Agent Tharpe had recovered from the vehicle during the traffic stop, which included blank Larry Thomas Transportation checks numbered 3340 through 3343, three driver's licenses, two from Tennessee and one from Mississippi, and a social security card. The Mississippi driver's license depicted a black man and the name Ronald W. Gaylord and the social security card was also in the name of Ronald Wayne Gaylord. The two Tennessee driver's licenses were in the names of Mark Campbell and Raymon Wallace, and both depicted black men. Officer Sipe identified the Defendant's shoes collected from the property room at the jail where the Defendant was housed, and he noted the shoes were consistent with the shoes in the photographs from the video surveillance footage at both banks.

Officer Sipe testified that he showed Larry Thomas Jr. two separate photographic line-ups, one containing a photograph of Redd and the other containing a picture of the Defendant. Thomas Jr. was unable to identify Redd but positively identified the Defendant as the second man he spoke with at the family business on June 9, 2006.

On cross-examination Officer Sipe agreed that the video surveillance footage from both the Manchester and Woodbury banks were black & white. Officer Sipe agreed that Leah Trail, the Manchester bank teller who assisted the Defendant, was shown a photographic lineup including Redd at the bank and later shown two photographic line-ups, including photographs of Redd and the Defendant, and could not make a positive identification.

Melissa Burnett, a First National Bank of Woodbury employee, identified Larry Thomas Transportation business check, check number 3339, made payable to Mark Campbell in the amount of $1500. She noted the check was endorsed with the name Mark Campbell. The check was stamp dated received on June 9, 2006, at 4:55p.m., and the check posted to the account on June 12, 2006. Burnett recalled receiving this check on June 9, 2006, and requested and viewed identification bearing the name Mark Campbell. Burnett viewed photographs taken from the surveillance camera in the bank and identified herself and the man who cashed the Larry Thomas Transportation business check in the photographs.

Leah Trail, a First National Bank of Manchester employee, identified Larry Thomas Transportation business check, check number 3338 in the amount of $1500 made payable to Ronald Gaylord and endorsed by Ronald Graylord. Trail said that the date and time stamped on the check at receipt of the check was June 9, 2006, at 4:13p.m. The date the check posted to the account was stamped onto the check as June 12, 2006. Trail recalled that a black man passed this check and that he produced a Mississippi driver's license bearing the name Ronald Gaylord. Trail viewed photographs taken from the surveillance camera in the bank and identified herself and the man who cashed the Larry Thomas Transportation business

-7-

check.

Trail testified that police showed her "one or two" photographic line-ups, and she was unable to identify the man who cashed the Larry Thomas Transportation business check. She said that later, at a preliminary hearing for this case, she identified the Defendant in court as the man who had cashed the check. Trail then identified the Defendant in court during the trial as the man she assisted on June 9, 2006. Trail explained that she could not identify the Defendant from the photographic line-up because the pictures were of poor quality, and she could not distinguish facial features well. Trail said that she was "confident" of her identification of the Defendant at the preliminary hearing and at trial. She recalled that, when the Defendant produced the driver's license, he explained to her that he had just moved to Tennessee and had not changed his driver's license yet. He asked Trail for other locations of First National Banks, and Trail told him of the branch in Woodbury and provided directions.

Based upon this evidence, the jury convicted the Defendant of theft of property under $500 and forgery over $1000.

### C. Sentencing Hearing

At the sentencing hearing, Laura Prosser, a Board of Probation and Parole pre-sentence report writer, testified that she prepared the pre-sentence report in this case. Prosser said that she ran an NCIC report for the Defendant and the report listed ten different names, three different birth dates, and six different social security numbers associated with the Defendant. Prosser specifically recounted each of the Defendant's convictions that she was able to verify, and how she verified the conviction. Ms. Prosser explained that convictions under different names or social security numbers are matched through fingerprints before convictions are combined in an NCIC report to ensure the correct convictions are associated with a particular defendant. Ms. Prosser described the Defendant's criminal history as extensive and said that this report was one of the "most difficult criminal histories [she has] had to investigate because of the numerous aliases." Ms. Prosser confirmed that her report listed eight felony convictions and nine misdemeanor convictions. Ms. Prosser testified that she found other convictions but, because she was unable to confirm those convictions, she did not include those convictions in her report. The State then submitted to the trial court four certified copies of the Defendant's felony convictions.

After the parties presented their proof as to sentencing, the trial court sentenced the Defendant as a career offender to an effective sentence of twelve years. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant argues on appeal that: (1) the trial court erred when it denied his motion to suppress; (2) the trial court erred when it admitted evidence of an uncharged forgery; (3) the trial court erred when it failed to instruct the jury on a lesser included offense; (4) the identification of the Defendant submitted at trial violated the "physical facts rule;" (5) the evidence at trial was insufficient to sustain his convictions; (6) he was denied his right to allocution; and (7) the trial court erred in sentencing the Defendant.[2]

### A. Motion to Suppress

The Defendant argues that the trial court erroneously denied his motion to suppress the evidence obtained as a result of the search of the vehicle in which the Defendant was a passenger. He asserts that police did not have the requisite reasonable suspicion to stop the car and that the duration of the stop was unreasonable. The State responds that the trial court properly denied the Defendant's motion because the initial stop was based on probable cause and the scope and time of the stop was not an unreasonable detention. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment." *State v. Downey*, 945

---

[2]The Defendant initially raised in his brief an issue regarding the ineffective assistance of counsel. At oral argument, however, his appellate counsel withdrew this argument to allow the Defendant to pursue this issue in a post-conviction petition at a later point, if he so chooses.

S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (1968)). Under these provisions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result of such a search or seizure should be suppressed unless the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

One such exception to the warrant requirement occurs when a police officer conducts a stop of an automobile based upon a reasonable suspicion or probable cause to believe that a traffic violation has occurred. *State v. Vineyard*, 958 S.W.2d 730, 734 (Tenn. 1997); *State v. Willie Norman*, No. W2003-02067-CCA-R3-CD, 2004 WL 2255253, at *6 (Tenn. Crim. App., at Jackson, Oct. 7, 2004), *no perm. app. filed* (holding that a police officer had reasonable suspicion to stop a defendant because the defendant ran a stop sign and had his music playing "extremely loud"). A police officer may stop a vehicle if the officer has probable cause, or a reasonable suspicion supported by specific and articulable facts, to believe that an offense has been or is about to be committed. *State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000). In *Whren v. United States*, the United States Supreme Court held that where an officer has probable cause to believe that a traffic violation has occurred, any seizure will be upheld even if it is a complete pretext for the officer's subjective motivations in making the stop. 517 U.S. 806, 813-14 (1996); *See also Vineyard*, 958 S.W.2d at 734.

A police officer's actions after conducting a stop must reasonably relate to the circumstances which justified the stop in the first place. *See Terry*, 392 U.S. at 20. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Moreover, the officer should employ the least intrusive means reasonably available to investigate his or her suspicions in a short period of time. *Id*. In determining the reasonableness of the detention, the proper inquiry is whether, during the detention, the officer diligently pursued a means of investigation that was likely to confirm or dispel his or her suspicions quickly. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "If the time, manner or scope of the investigation exceeds the proper parameters," a constitutionally permissible stop may be transformed into an impermissible stop. *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002). If the officer develops a reasonable suspicion that the occupant is engaged in other criminal activity during a valid stop, further detention is justified. *State v. Branden Haney and Lawrence Davis*, No. E2002-00559-CCA-R3-CD, 2003 WL 22169708, at *5 (Tenn. Crim. App., at Knoxville, Sept. 19, 2003). The reviewing court considers the totality of the circumstances to determine whether police officers had reasonable suspicion to expand the scope of a traffic stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In the case under submission, the trial court denied the Defendant's motion to suppress, finding that the Defendant had no standing as a passenger in the vehicle.

Thereafter, the United States Supreme Court decided *Brendlin v. California,* which held that passengers are seized during a traffic stop and thereby have the standing to contest an illegal seizure. *Brendlin v. California*, 551 U.S. 249 (2007). The trial court reconsidered the current case in light of *Brendlin* and made the following finding:

> It does appear from the authority of *Brendlin* that [the Defendant] may have standing to challenge the stop as unconstitutional in this cause. However, after reviewing the offer of proof and the other evidence presented at trial, the traffic stop in question would have been upheld as a lawful stop based on reasonable suspicion of a traffic violation. Additionally, the Court finds that the traffic stop was not so long as to render the stop unconstitutional. The testimony by the officer in question was that he had reasonable suspicion to believe that a citable offense had occurred.

A traffic stop subjects the passengers, as well as the driver, to a seizure. *Brendlin v. California*, 551 U.S. 249 (2007). Therefore, the Defendant has standing to challenge the validity of the initial stop and his subsequent detention. Turning to the facts of this case, it is clear that Agent Tharpe had reasonable justification to make a traffic stop due to the vehicle following another vehicle too closely. *See* T.C.A. § 55-8-124 (2008). After pulling the vehicle over for following a tractor-trailer too closely, neither the driver, Redd, nor the Defendant could produce a driver's license or identification. When further questioned, Redd and the Defendant became "nervous" and "evasive." Agent Tharpe requested back-up, which arrived within ten minutes, and the assisting officer conducted a canine search and then full search of the vehicle after the canine officer "indicated" on the passenger door of the vehicle. Meanwhile, Agent Tharpe tried to confirm Redd's driver's license and identity, the Defendant's identity, and ownership of the vehicle with only the verbal information provided by Redd and the Defendant. After the search of the vehicle revealed multiple blank business checks, three identification cards with three different names, one from Mississippi, and a social security card, none of which matched the names Redd and the Defendant provided to Agent Tharpe, Agent Tharpe then contacted the owner of the business to ensure that the checks were rightfully possessed by Redd and/or the Defendant. The duration of this stop was approximately two hours and encompassed not only investigation related to the initial traffic stop, but Agent Tharpe's reasonable suspicion that Redd and the Defendant were engaged in other criminal activity warranting further detention. Based upon the facts of this case, Agent Tharpe had the requisite reasonable suspicion to conduct the traffic stop. Further, we can not conclude that the length of the detention was excessive. The Defendant is not entitled to relief as to this issue.

### B. Admission of an Uncharged Forgery

-11-

The Defendant asserts that the trial court erred when it admitted testimony regarding the passing of check number 3339 at the Woodbury First National Bank because it was "irrelevant and prejudicial." The State responds that, because the Defendant failed to object to the testimony at trial or to the photographs from the bank's surveillance camera, this issue is waived. We agree with the State.

Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). In this case the record shows that the Defendant made no objection during the presentation of this evidence. Accordingly, we conclude the Defendant waived our review of this issue, and he is not entitled to relief.

### C. Jury Charge

The Defendant asserts that the trial court erred when it failed to instruct the jury on the lesser included offense of facilitation of forgery. The State responds that the Defendant expressly waived a jury instruction on facilitation by failing to request the instruction in writing pursuant to Tennessee Code Annotated section 40-18-118(c).

A trial court is required to instruct on crimes "supported by the evidence." *State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006). Tennessee Code Annotated section 40-18-110, however, requires the defendant to request lesser included offense instructions in writing at trial in order to subsequently appeal a trial court's failure to instruct on such offenses. T.C.A. § 40-18-110(b), (c) (2006). This section states, in pertinent part:

> (b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any such charge.

> (c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, such instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for new trial or on appeal.

T.C.A. § 40-18-110(b), (c) (2006). In *State v. Page*, 184 S.W.3d 223 (Tenn. 2006), the Tennessee Supreme Court determined that Tennessee Code Annotated § 40-18-110 was constitutional, concluding that "if a defendant fails to request an instruction on a lesser-included offense in writing at trial, the issue will be waived for purposes of plenary appellate review and cannot be cited as error in a motion for new trial or on appeal." *Page*, 184 S.W.3d at 229.

We have throughly reviewed the record and discovered no written request for an instruction on facilitation. Nor has the Defendant cited to the location of any written request. Therefore, this issue is waived for purposes of appeal.

### D. Violation of the "Physical Facts Rule"

The Defendant attacks his identification by witnesses Larry Thomas Jr. and Leah Trail on the basis that these witnesses' testimony is "beyond logic" and, thus, inconsistent with the "physical facts." He asserts that Trail's inability to identify the Defendant in a photographic line-up but, shortly thereafter, identify the Defendant in court during the preliminary hearing, "violates generally accepted physical facts concerning memory." Likewise, he contends that the fact that Thomas Jr. identified the Defendant but not Redd, who he spent a much longer period of time with, in a photographic line-up "violates generally accepted physical facts concerning memory." The State responds that the identification of the Defendant did not violate any laws of physics or indisputable facts about human perception. We agree with the State.

The "physical facts rule" has been explained as "the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded." *State v. Hornsby*, 858 S.W.2d 892, 894 (Tenn. 1993). The rule comes into play when "the testimony of a witness 'cannot possibly be true, is inherently unbelievable, or is opposed to natural laws,' [so that] courts can declare the testimony incredible as a matter of law and decline to consider it," and when "'undisputed physical facts are entirely inconsistent with and opposed to testimony.'" *Id.* (quoting *United States v. Narciso*, 446 F. Supp. 252, 282 (E.D. Mich. 1977) and *Wood v. United States*, 342 F.2d 708, 713 (8th Cir. 1965)). A high threshold, however, must first be surmounted to apply the rule. "We caution," wrote our Supreme Court in *Hornsby*, "that the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly." *Id.* at 895. The court continued,

> Only when the testimony is inherently improbable and impossible of belief should courts intervene to declare it incredible as a matter of law. When the

testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility. Deciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province of the jury. As the court observed . . . "the improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses."

*Id*. at 895-96 (citations omitted).

Both of the instances raised by the Defendant in this issue go to the credibility of the witnesses. Defense counsel cross-examined both witnesses on their identifications and any inconsistencies or discrepancies were raised before the jury. These instances do not represent testimony that is "entirely irreconcilable with the physical evidence." *Hornsby*, 858 S.W.2d at 894. In fact, Trail explained to the jury that her inability to identify the Defendant in the photographic line-up and yet shortly thereafter identify the Defendant in court was due to the poor quality of the photographs in the line-up. Further, Mr. Thomas's testimony that he identified the Defendant in a photographic line-up and yet did not identify Redd in a separate photographic line-up is not "impossible of belief." *Id.* Accordingly, we do not find that these identifications violate the "Physical Facts Rule" and, thus, will consider the testimony in our review of the sufficiency of the evidence below.

### E. Sufficiency of the Evidence

The Defendant contends that there is insufficient evidence to support his convictions. He argues that the evidence did not establish his identity as the person who passed the forged check, there was no proof that he wrote anything on the check or received any value from the forged check, and that the State failed to prove the value of the blank checks. The State responds that there was more than sufficient evidence to support the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.

*Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of forgery which is defined, in pertinent part, as follows:

> (a) A person commits an offense who forges a writing with intent to defraud or harm another.

(b) As used in this part, unless the context otherwise requires:

(1) "Forge" means to:

(A) Alter, make, complete, execute or authenticate any writing so that it purports to:

(i) Be the act of another who did not authorize the act;

. . . .

(c) Issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A)[.]

T.C.A. § 39-14-114(a), (b)(1)(A)(i), and (b)(1)(c) (2010).

The jury also convicted the Defendant of theft of property under $500. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2010).

The evidence, considered in the light most favorable to the State, proves that the Defendant and Redd went to Larry Thomas Transportation under the guise of purchasing a work van. Redd showed interest in two vans toward the back of the lot, outside the view of the front of the office, while the Defendant remained in the front area unseen by Larry Thomas, Jr. As Redd and Thomas Jr. made their way to the front of the office, the Defendant appeared, and the three men again looked at a van toward the rear of the lot. Before leaving, the Defendant went inside the office alone to use the restroom and then the Defendant and Redd left, saying they had to return to work but would be back that evening. That same day in Manchester, the Defendant passed a forged Larry Thomas Transportation check, check number 3338, in the amount of $1500. The signature on check number 3338 was not that of Larry Thomas, Sr., his wife, or his son, who were the only persons authorized to sign checks on the account. Several days later, police found the four remaining blank Larry Thomas Transportation checks, check numbers 3340 through 3343. The checks were found in a vehicle in which the Defendant was a passenger underneath the mat on the side of the vehicle where the Defendant was a passenger. Also under that floormat, police found three false identification cards and a social security card. The card bore the same name used to pass the forged check at the Manchester branch of the bank. Police confirmed with Larry Thomas, Sr. that six checks, check numbers 3338 through 3343, were missing from his business check binder and that he had not given anyone permission to take or use those checks.

As to the Defendant's contention that the evidence is insufficient as to his theft conviction because the State failed to prove the value of the stolen checks, we agree with the Defendant that the value of the property taken is an element of the offense and must be proven. *See State v. Mike Wayne Tate*, C.C.A. No. 03C01-9204-CR-127, (Tenn. Crim. App. filed March 4, 1993, at Knoxville); Tenn. Code Ann. § 39-14-105 (2010). While this Court may not presume the range of value of an item, we can assume that the checks, as a means for an account holder to access funds, has a monetary value over zero. The exact value of stolen property only becomes relevant when the State seeks a conviction for felony theft. *See State v. Jarvis Loverson*, No. W1999-01750-CCA-R3-CD, 2000 WL 1664276, at *3 (Tenn. Crim. App., at Jackson, Oct. 23, 2000), *no perm. app. filed.*

Based upon this evidence, we conclude that a rational jury could find the Defendant guilty beyond a reasonable doubt as to theft of property under $500 and forgery. The Defendant is not entitled to relief on this issue.

## F. Allocution

The Defendant argues that the trial court's failure to perform its duties as required by Tennessee Code Annotated section 40-35-210(b)(6) deprived the Defendant of his right of allocution. The State responds that the record shows that the Defendant discussed the issue of making a statement or testifying with defense counsel and was given the opportunity to speak to the trial court.

At the sentencing hearing, the following exchange occurred in reference to the Defendant's decision to make an allocution statement:

Trial Counsel:     Your Honor, may I have a five-minute recess to talk to my client about whether he wants to testify or not? I have previously talked to him but - -

Trial Court:     You can.

(A recess was taken.)

Trial Court:     All right. [Trial Counsel], go ahead.

Trial Counsel:     My client doesn't wish to make a statement at this sentencing.

Trial Court:     Okay. He understands he has a right to do so; is that

-17-

correct?

Trial Counsel: I believe so. (Addressing [the Defendant])You understand that you have a right to testify today?

The Defendant: As I discussed with you, I don't particularly want to testify. I wanted to say something before I was sentenced, but I don't know if we can distinguish the difference.

Trial Counsel: There is a couple of motions that my client would like to make. I can make that through my comments, but I think, [Defendant], you don't want to take the stand and testify today, do you?

The Defendant: It wouldn't serve any purpose.

Trial Counsel: Okay.

Trial Court: You understand you have the right to do so, Mr. Wright?

The Defendant: Yes, sir, but does that waive my - - if I am objecting - - I mean, my main objection is to this notice. Does that waive that objection?

Trial Court: I wouldn't think so.

The Defendant: Okay, and that I do have three handwritten motions that [Trial Counsel] - - I got them prepared very late. I wrote you a letter.

Trial Court: I got it. I handed it to him.

The Defendant: I'm not asking the Court to actually hear them today, but I just wanted to - -

Trial Court: Okay. I will let [Trial Counsel] talk about those.

In denying the Defendant's motion for a new trial, the trial court said as to the issue of allocution, "the Defendant was given ample opportunity to address the Court during his

sentencing hearing, and in the end [the] Defendant's attorney said he did not want to make a statement."

Allocution has been defined "as the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction." *State v. Stephenson*, 878 S.W.2d 530, 551 (Tenn. 1994) (citing BLACK'S LAW DICTIONARY 76 (6th ed. 1990)) (footnote omitted). It is "[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." BLACK'S LAW DICTIONARY 75 (7th ed. 1999); *see also United States v. Gilbert*, 244 F.3d 888, 924 (11th Cir. 2001). Tennessee Code Annotated section 40-35-210(b)(7) mandates that, in a non-capital case, a defendant be allowed allocution before a sentencing judge or jury. This section provides, "To determine the specific sentence and the appropriate combination of sentencing alternatives that shall be imposed on the defendant, the court shall consider ... [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing." T.C.A. § 40-35-210(b)(7) (2010). "The trial judge, in determining the appropriate sentence . . . shall consider, among several factors, any statement the defendant wishes to make in his own behalf about sentencing . . . ." S*tephenson*, 878 S.W.2d at 551.

In the case under submission, the evidence showed that trial counsel discussed with the Defendant prior to sentencing whether the Defendant wanted to testify on his own behalf or make a statement. In court, trial counsel asked the Defendant if he wanted to testify, and the Defendant responded that he did not. The trial court also confirmed that the Defendant understood he had the right to give a statement to be considered in sentencing. The Defendant did, in fact, discuss several concerns, unrelated to sentencing, with the trial court. We agree with the trial court that the Defendant was given ample opportunity to speak. The Defendant chose not to execute his right to allocution. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

### E. Sentencing

The Defendant's final argument attacks the trial court's determination that the Defendant be sentenced as a career offender. He contends that the State's notice of intent to seek an enhanced punishment was both deficient and untimely and that the State failed to prove the existence of the alleged prior convictions. The State responds that the notice was timely and fairly informed the Defendant of the State's intentions. Further, the State asserts that the trial court correctly found the Defendant to be a career offender based upon the proof presented at the sentencing hearing. We agree with the State.

Tennessee Code Annotated section 40-35-202(a) states:

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea.

*See also* Tenn. R. Crim. P. 12.3. The Tennessee Supreme Court has stated:

> The purpose of subsection (a) is to provide fair notice to an accused that he is exposed to other than standard sentencing. It is intended to order plea-bargaining, to inform decisions to enter a guilty plea, and to aid to some extent trial strategy. Notice is important not only in preparation for a sentencing hearing, but in evaluating the risks and charting a course of action before trial. The Legislature has expressly placed the responsibility of notice upon the district attorney, along with the discretion to seek enhanced sentencing.

> When the notice is given only shortly before trial, an accused may not rest on the State's error, but must claim needed time by seeking a continuance and show some prejudice from the late filing.

*State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990) (citation omitted).

### 1. Timely Notice

The Defendant's case was originally set for trial on December 18, 2006. The State filed a notice of intent to seek enhanced punishment on December 15, 2006, three days before trial. A mistrial was declared on the day of trial, however, based upon a poor working relationship between the Defendant and his attorney at the time. New counsel was appointed and a plea deadline was set for January 16, 2007. Thereafter, the trial court set another trial date for May 30, 2007.

When the Defendant raised his complaint as to timely notice of the State's intent to seek enhanced punishment at his sentencing hearing, the trial court made the following findings:

> I believe the State has complied with the requirements of the rule. It may not

be exactly as you want it, [trial counsel] and [Defendant], but it is a good notice. I find that it was given, although within the 10 days of the first trial, it is still good as to the second trial. Several months elapsed from the time that [trial counsel was] appointed until the trial in the matter. You did have time to do your own investigation to rebut. Nobody asked for a continuance prior to the second trial to have more time to rebut or to investigate any of these convictions. The notice itself has the date of conviction, the nature of the conviction, and the conviction court.

While the notice in this case was late for the first trial date, it was filed more than five months before the actual trial date for these charges. *See State v. Carter*, 121 S.W.3d 579, 585 (Tenn. 2003). Further, the record does not indicate that the Defendant moved for a continuance before trial or that he objected to the notice. The fact that the notice is not filed until the date trial begins does not render the notice ineffective in the absence of some showing of prejudice on the part of the defendant, particularly where defense counsel does not move for a continuance or postponement of the trial as he is clearly authorized to do under Tennessee Rule of Criminal Procedure 12.3(a). *See State v. Stephenson*, 752 S.W.2d 80, 81 (Tenn. 1988). The Defendant was on notice of the State's intent to seek enhanced punishment well before his trial in the case, and he cannot show that he was, in any way, prejudiced. Therefore, he is not entitled to relief on this issue

### 2. Deficient Notice

The Defendant contends that the notice was deficient because the notice: (1) failed to distinguish between felony and misdemeanor convictions; (2) it listed offenses rather than convictions, (3) contained a conviction date discrepancy with the presentence report; (3) listed "Shelby County, Tennessee" as the court of conviction for two of the convictions while the presentence report listed "U.S. District Court, Western Division of Tennessee;" (4) did not list a conviction that the presentence report listed; and (5) listed the city of conviction for two convictions where the presentence report listed the actual court.

The trial court made the following findings in its sentencing order:

[T]he Court specifically finds that the State's Notice of Intent to Seek Enhanced Sentencing, both, met the minimum requirements to constitute a "notice" under the Statute; and was properly and timely filed to place the accused on "fair notice" that the State was seeking enhanced punishment. In fact this Court has "bent over backwards" to give the defendant and his counsel time to rebut the same. The Court also finds that information on the presentence report is reliable hearsay. The author of the presentence report has

-21-

done more than her duty in authenticating the convictions upon which the State and this Court relies. The offender has a criminal history which includes the extensive use of up to eight (8) aliases and different social security numbers. His criminal history also crosses several state lines and jurisdictions. The Court takes note that the defendant has never put on evidence that negates the prior convictions in question.

The notice provision found in Tennessee Code Annotated section 40-35-202(a) requires that the State file: (1) written notice; (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range; (3) setting forth the nature of the prior felony conviction, the dates of conviction, and the identity of the courts of the conviction. As we earlier stated, the purpose of this notice is: (1) to provide fair notice of potential exposure to enhanced standard sentencing; (2) to allow informed decisions as to guilty pleas; and (3) to aid trial strategy. *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990). Our Supreme Court has stated that "When a detail of the required information is omitted or incorrect, the inquiry should be whether the notice was materially misleading. Where an ambiguity or contradiction appears on the face of the notice, defendant has a duty to inquire further." *Id*. "In other words, what is required is 'fair' notice, not 'perfect' notice." *State v. Livingston*, 197 S.W.3d 710, 712-14 (Tenn. 2006).

Our review of the record reveals a written notice of intent to seek enhanced punishment, filed December 15, 2006, listing the dates of convictions, nature of convictions, and convicting courts. The State's notice in this case, while not perfect, was fair. The errors the Defendant complains of are more clerical in nature and do not render the State's notice "materially misleading." *Adams*, 788 S.W.2d at 559. Based upon the forty convictions the State listed in its notice, the Defendant was certainly aware that he would be exposed to enhanced punishment based upon his criminal history.

The State has substantially complied with the statute, so the accused has a duty to inquire about ambiguous or incomplete notice and must show prejudice to obtain relief. *Adams*, 778 S.W.2d at 559. In this case, the State's notice made the Defendant aware of its intent to seek an enhanced range of punishment. He was provided the convictions upon which the State would rely in advance of trial and, thus, was in a position to plan case strategy, including determining whether or not the Defendant was actually convicted of the crimes listed in the notice. The Defendant also had sufficient time to inquire into any ambiguities or mistakes in the document, and he failed to do so. As the trial court pointed out, some of the difficulty the State faced in accurately collecting the Defendant's criminal history lies with the Defendant, who used as many as eight aliases and different social security numbers. Further, the Defendant makes no argument that the convictions are not accurate. Accordingly, we conclude that the errors in the State's notice are not "materially

misleading" and the Defendant has failed to show any prejudice resulting from the errors. The Defendant is not entitled to relief as to this issue.

### 3. Career Offender

The Defendant claims that there was insufficient evidence presented at the sentencing hearing for the trial court to sentence him as a career offender. The Defendant appears to take issue with the trial court's consideration of Prosser's testimony regarding her preparation of the report and the presentence report itself. After hearing extensive proof on the Defendant's criminal history, the trial court stated that it would indicate in its sentencing order which convictions it would consider. These details were not included in the sentencing order, however, the trial court made a finding that the Defendant had "six (6) prior felony convictions" and declared the Defendant a career offender.

This Court has consistently held that information in a presentence report is reliable hearsay which may be admitted if the opposing party is offered the opportunity to rebut the same. *See State v. Baker*, 956 S.W.2d 8, 17 (Tenn. Crim. App.1997); *State v. Richardson*, 875 S.W.2d 671, 677 (Tenn. Crim. App. 1993); *State v. Randolph Scott Jennings*, No. E2001-02118-CCA-R3-CD, 2002 WL 31730884, at *5 (Tenn. Crim. App., at Knoxville, Dec. 6, 2002), *perm. app. denied* (Tenn. August 21, 2006). The trial court is also required to consider the presentence report before imposing a sentence. T.C.A. § 40-35-210(b)(2) (2010). Moreover, the Tennessee Criminal Sentencing Reform Act of 1989 contemplates that much of the information contained in a presentence report will be hearsay. *Baker*, 956 S.W.2d at 17. However, the information is reliable because it is "based upon the presentence officer's research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report." *Id*.

The State called the preparer of the presentence report, Prosser, to testify regarding her investigation into the Defendant's criminal history. She testified extensively as to her contact with relevant agencies to confirm the Defendant's eight felony and nine misdemeanor convictions. The Defendant was afforded the fair opportunity to rebut any of these convictions and failed to do so. The Defendant did not contend that the presentence report or Prosser's testimony was incorrect. As a result, the presentence report and testimony of Prosser were properly admitted by the trial court as reliable hearsay. *See* T.C.A. § 40-35-309(b) (2010). The State submitted certified copies of convictions for four of the Defendant's felony convictions. A certified copy of conviction for the remaining two convictions necessary for the trial court to find the Defendant a career offender was not required to establish the convictions by a preponderance of the evidence, and the trial court properly relied on the presentence report and Prosser's testimony. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE